1  ADRIAN M. PRUETZ - State Bar No. 118215
   apruetz@glaserweil.com
2  ERICA J. VAN LOON - State Bar No. 227712
   evanloon@glaserweil.com
3  JESSICA E. MENDELSON – State Bar No. 280388
   jmendelson@glaserweil.com
4  GLASER WEIL FINK JACOBS
5    HOWARD AVCHEN & SHAPIRO LLP
   10250 Constellation Boulevard, 19th Floor
6  Los Angeles, California 90067
7  Telephone:  (310) 553-3000
   Facsimile:   (310) 556-2920
8
   Attorneys for Plaintiff
9  SHK Management, Inc.
   d/b/a/ Korman Communities, Inc.
10

11             UNITED STATES DISTRICT COURT

12             CENTRAL DISTRICT OF CALIFORNIA

13                  WESTERN DIVISION

14

15 
   SHK MANAGEMENT, INC. d/b/a        CASE NO.:
16 KORMAN COMMUNITIES INC., a
   Pennsylvania corporation,         **COMPLAINT FOR:**
17
18             Plaintiff,            **(1) BREACH OF CONTRACT;**
                                     **(2) MISAPPROPRIATION OF**
19 v.                               **    TRADE SECRETS;**
                                     **(3) TRADE DRESS**
20                                   **    INFRINGEMENT;**
   KILROY REALTY CORPORATION, a      **(4) FRAUD: FRAUD IN THE**
21 Maryland corporation; and DOES 1  **    INDUCEMENT;**
   through 10,                       **(5) FRAUD: PROMISE WITHOUT**
22                                   **    INTENT TO PERFORM;**
23             Defendant.            **(6) BREACH OF IMPLIED**
                                     **    COVENANT OF GOOD FAITH**
24                                   **    AND FAIR DEALING;**
25                                   **(7) UNJUST ENRICHMENT**
26
                                     **[JURY TRIAL DEMANDED]**
27
28

862279

1    Plaintiff SHK Management, Inc. d/b/a Korman Communities, Inc. ("Korman"
2    or "Plaintiff") submits the following Complaint against Defendants Kilroy Realty
3    Corporation ("Kilroy") and DOES 1-10 (collectively "Defendants") and alleges as
4    follows:

5                    **JURISDICTION AND VENUE**

6         1.    This Court has subject matter jurisdiction over the federal claim pursuant
7    to 15 U.S.C. §1125 et seq.  and 28 U.S.C. § 1331 and 1338.  This Court has diversity
8    jurisdiction over this action under 28 U.S.C. § 1332.  Diversity exists as Plaintiff
9    Korman is a Pennsylvania corporation with its principal place of business located in
10   Pennsylvania and, on information and belief, Defendant Kilroy is a Maryland
11   corporation with its principal place of business located in California.  The amount in
12   controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

13        2.    This Court has personal jurisdiction over Kilroy and venue in this
14   District is proper under 28 U.S.C. § 1391(b) and (c) because Kilroy resides in this
15   District and solicits, transacts and does business in this District, a substantial part of
16   the wrongful acts or omissions complained of occurred in this District, and Kilroy is
17   subject to personal jurisdiction in this District.

18        3.    An immediate, real and substantial controversy exists between Korman
19   and Kilroy with respect to, among other things, whether Kilroy has breached its
20   contract with Korman and reneged on its promises to Korman, and otherwise caused
21   Korman substantial harm by, among other things, misappropriating Korman's trade
22   secrets, infringing Korman's trade dress and fraudulently inducing Korman to enter a
23   contract with Kilroy which Kilroy had no intention of actually performing.

24                      **THE PARTIES**

25        4.    Korman is a Pennsylvania corporation, with its principal place of
26   business at 220 West Germantown Pike, Suite 250, Plymouth Meeting, Pennsylvania
27   19462.

28

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

1
COMPLAINT

862279

5.     On information and belief, Kilroy is a Maryland corporation with its principal place of business at 12200 W. Olympic Blvd, Suite 200, Los Angeles, California 90064.

6.     Korman is unaware of the true names and capacities of Defendants sued hereunder as DOES 1 through 10 inclusive, and therefore sues these Defendants by such fictitious names.  Korman is informed and believes and thereon alleges that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, and that Korman's damages as herein alleged were proximately caused by their conduct.  Korman will amend this complaint to allege the true names and capacities of the defendants DOES 1 through 10 when ascertained.

## FACTUAL ALLEGATIONS

### The AKA Model

7.     Korman is a well-known real estate company that, among other things, develops and manages real property.  The company is family-run, and has been for four generations, since the company's initial founding one hundred years ago. Korman revolutionized the concept of furnished apartments in Philadelphia fifty years ago, and has been a leader in the development of such projects ever since.  In 2005, Korman first launched AKA, a unique flexible-stay residence which balances the style and hospitality of an intimate hotel with the space and comfort of a fully appointed luxury condominium.  Korman was the only company in the United States to develop and operate this type of owner-operated property.  Korman has AKA properties in London, New York, Beverly Hills, Washington D.C., and Philadelphia.

8.     AKA is unique in that its long-term residences feature four-star hotel services with full-time front desk staff and doormen, sophisticated cafes and lounges, fitness centers and spa services, as well as business and meeting centers.  These properties combine the comforts of home with the luxury and convenience of a hotel.

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

862279

## Initial Relationship Between Kilroy and Korman

9.     In the fall of 2012, Bradley Korman of Korman first met with David Simon of Kilroy.  Mr. Simon mentioned that Kilroy was planning to open a mixed use campus in the Hollywood area, known as Columbia Square (the "Columbia Square Project").  Mr. Simon explained that Kilroy was in search of a company to partner with on the Columbia Square Project and was extremely interested in working with Korman.

10.     In December 2012, Kilroy and Korman negotiated their respective roles in the development of the Columbia Square Project.  Mr. Simon asked Korman to use its expertise on designs for the Columbia Square Project, as well as provide information on Korman's typical development plan, because "in my mind we need a good partner who can guide the development to make sure we build the right product."

11.     Mr. Simon subsequently proposed terms for an agreement between Kilroy and Korman.  The agreement between the parties included specific duties each party would perform, as well as the fees which Korman was to receive in exchange for performance.

12.     On December 18, 2012, Mr. Simon sent Mr. Korman an email explaining how he envisioned the "partnership" between Kilroy and Korman.  According to Simon, "Kilroy is the master developer. . . Korman will bring expertise in design and programming."

13.     The following month, Korman requested a written agreement from Kilroy.  Mr. Simon explained he fully intended to provide Korman with such an agreement and that Korman would receive it soon.

14.     In reliance on Mr. Simon's promise, Korman scheduled a series of meetings and calls with Kilroy and its employees to discuss the design and development of the Columbia Square Project.  Korman also created property designs,

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

3
COMPLAINT

862279

and provided Kilroy executives with multiple tours of the AKA properties in the northeastern United States.

### Kilroy Changes the Scope of the Project

15.     Kilroy originally contemplated the Columbia Square Project as a multi-use space consisting of both office space and apartments.  However, after seeing the success of Korman's AKA properties, Kilroy changed the scope of the project completely.  Rather than include standard apartments, as Kilroy had done in the past, the Columbia Square Project would include flexible-stay furnished luxury hotel residences, much like those Korman had previously developed.

16.     Kilroy had absolutely no experience with this type of project.

17.     In January 2013, Korman again requested a written contract.  Mr. Simon promised it was forthcoming and stated he was simply making cosmetic changes.

18.     In full reliance on Mr. Simon's promise, Korman sent Kilroy confidential and proprietary documents describing the creation and management of AKA, including but not limited to Korman's Confidential Hollywood Model and Proforma, the Historical AVE Portfolio Financials and Historical Occupancies from Korman's other projects ("Korman Trade Secrets").

19.     The Korman Trade Secrets were marked confidential and were not intended to be distributed to third parties.  The Korman Trade Secrets were only intended for use as part of the business relationship between Kilroy and Korman.

20.     On information and belief, Kilroy was fully aware that the Korman Trade Secrets were only intended for use as part of the business relationship with Korman.

21.     Following the receipt of the Korman Trade Secrets, Kilroy requested that Korman fill out a Columbia Square Apartment Tower Program Questionnaire (the "Questionnaire").  The Questionnaire was to be used by Kilroy's architects, Rios Clementi Hale Studios, in the development of the Columbia Square Project.  The Questionnaire sought information regarding Korman's vision for the project, as well

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

as additional confidential business information, such as Korman's breakdown of units, price points, and design information.

22.    Korman responded to Kilroy the following week, explaining that their vision of the Columbia Square Project included a "unique collection of urban, high-rise, flexible-stay furnished hotel residences in prime metropolitan markets" and provided specific information about their target guests, who included business, entertainment, and creative professionals.  Korman also provided Kilroy with confidential and proprietary information regarding the design of the apartment, including the architecture, layout of the facilities, types of furniture, and the types of units in each building.

## AKA Trade Dress

23.    In addition to requesting information regarding price points and the breakdown of units, Kilroy also requested information regarding the AKA design.

24.    Korman provided Kilroy with a detailed description of the AKA properties and their trade dress ("AKA Trade Dress") explaining, "Luxury connotes architecturally refined apartments and public spaces built with quality, sophisticated, contemporary materials and finishes, including Carrara marble in bathrooms and kitchen counters" and "smoked white oak, wide-planked flooring in apartment living areas, kitchens and the public lobby."  AKA properties also have other luxurious elements, including high ceilings, and gas-burning fireplaces.

25.    Korman also specified that the kitchens in the AKA properties included marble counters, classic, modern wood cabinetry, upgraded stainless steel appliances from top brands.  Additionally, the furniture found in the AKA properties is "modern, comfortable, yet clean-lined and durable, and functional for guest needs" and includes furnishings from leading manufacturers like Cassina, B and B Italia, Zanotta, and Arper.

26.    AKA properties also include amenities and public areas including pools with hot tubs for lounge seating and sunning, outdoor space to relax and unwind, a

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

fitness center with modern gym equipment, a business center, a movie screening room, a roof deck bar and lounge, and a small lobby bar serving well-made cocktails. Collectively, the design elements described in this section are known as the "AKA Trade Dress."

**Kilroy Continues to Delay Providing Korman with A Final Written Contract**

27.     On January 27, 2013 Mr. Simon sent Mr. Korman an email with additional deal points.  Mr. Simon's email provided specific duties which Korman would perform, including marketing, management and sales.  In exchange for performance of these duties, Korman would receive a 3% fee, as well as a $500,000 development consultant fee.

28.     In addition to providing the deal points, Mr. Simon also requested additional confidential and proprietary information from Korman, including a copy of Korman's standard management agreement.  Kilroy also requested confidential and proprietary information regarding Korman's typical marketing activities, such as the size of their sales staff and their goals and incentives, the channels through which the apartments are rented, and typical staffing and salaries for AKA employees.

29.     In early February, Mr. Simon and Mr. Korman spoke on the phone regarding the agreement between the parties.  Mr. Korman sent Mr. Simon a confirmation email with the terms, and requested that Kilroy finalize the written contract between the parties.  Mr. Simon responded, "Let me work on this and I will get back to you next week."

30.     In late February, Mr. Simon explained that the structure of the deal "aligns our interests appropriately," but the "termination component" needs to be worked on.  During this time, Mr. Simon visited Korman's Beverly Hills property to get a better idea of Korman's model.  Following the tour, Mr. Simon told Mr. Korman that Korman's model was "a perfect fit for the Hollywood market."

31.     Mr. Simon reiterated to Mr. Korman that he was looking forward to working with Korman.  Mr. Simon also told Mr. Korman that Kilroy would be

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

862279

developing multiple projects involving urban, high-rise, flexible-stay furnished hotel residences along the west coast, and that Korman should expect to be involved in these projects. On this basis, Korman declined to participate in other directly competing projects in the Hollywood area and aggressively stopped pursuing similar opportunities.

32.     On March 5, 2013, Mr. Simon revised the terms memorialized in the parties' February 2013 email, agreeing Korman would receive a 3% management and franchise fee, as well as 3% on total revenues, and a $500,000 development consultant fee.

33.     Based on Mr. Simon's emails, Korman understood the partnership between the parties was fully underway.   Korman began to meet with the architects for the project, Rios Clementi Hale Studios.  During this time, Korman completely revised Kilroy's proposed floor plans to create something more in line with the AKA properties, rather than Kilroy's standard apartment buildings.

34.     At this time, Mr. Simon also requested Korman provide him with tours of each of the existing AKA properties, so that he could get a feel for Korman's vision.

35.     Mr. Simon continued to tell Mr. Korman that Korman would be "a big part of [the project's] success, and encouraged Korman to post the animation Kilroy had developed for the Columbia Square Project to the Korman website.

### The Initial Contract

36.     After continued prodding from Korman, on April 19, 2013, Kilroy provided Korman with a signed Term Sheet for the Columbia Square Project ("the Initial Contract").  The term sheet created a ten year agreement between the parties for "the management of 200 luxury apartments to be developed at Columbia Square." Under the terms of the agreement, Kilroy was to provide Korman with a management and franchise fee for various services, including, but not limited to "management, marketing, sales, marketing activities, website development, brand advertising, [and]

862279

1  PR." Kilroy would also provide incentive fees for incremental cash flow above a

2  base NOI, as well as a development consultant fee.

3      37.     In addition, the Initial Contract contained a termination provision,

4  whereby if Kilroy proceeded with the project without Korman, Korman would receive

5  a $500,000 termination fee from Kilroy.

6      38.     On April 26, 2013, Kilroy provided Korman with a Scope of Services

7  Sheet, which detailed the specific services Korman would perform.  These services

8  included providing an in-house design and operations team to collaborate with Kilroy

9  and providing designs for the parking lot and lobbies, the ground floor of the

10  residential towers, the common areas, and the apartment units themselves.  Korman

11  was also responsible for a marketing and leasing plan for the property, as well as an

12  operations budget and business plan for the project.

13      39.     In early May, Korman provided Kilroy with a copy of their projected

14  allocated expenses.  Subsequently, Mr. Simon told Mr. Korman that he would provide

15  Mr. Korman with a revised written agreement "by the end of the week."  Korman

16  continued to perform their responsibilities as required under the Initial Contract.

17      40.     In early June, Mr. Simon provided Mr. Korman with a written

18  Management Agreement.  Under the terms of the agreement, if Kilroy were to

19  proceed with the development of the property without Korman, Kilroy would be

20  required to pay a $500,000 termination fee.

21      41.     In mid-June, following their review of this agreement, Korman submitted

22  a markup of the agreement to Kilroy.  Mr. Simon explained to Mr. Korman, "This is a

23  priority for me. . . we want to do a big press release with you guys in mid-July."

24                        **Kilroy Reveals Its True Intentions**

25      42.     After providing Korman with the markup, Mr. Simon continued to

26  represent that the revised Management Agreement was forthcoming, but there were

27  other priorities for Kilroy prior to the official announcement of the Columbia Square

28  Project.  Mr. Simon continued to request information from Korman, effectively

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

862279

engaging in a fact-finding mission to gain information for various parties, including Kilroy's accountants, attorneys, and operations employees. Mr. Simon explained that Kilroy would officially announce Korman as their partner in the development of the project in mid-July.

43.     During this time, Korman continued to perform the duties required of them in the Initial Contract.  Mid-July came and went, however, and Korman heard nothing, despite repeated attempts to contact Mr. Simon.

44.     On July 22, 2013, Mr. Korman was stunned to find himself in receipt of an email intended for someone else:  Brad Korzen, the CEO of Kor Group.  The email was from Mr. Simon, and conveyed that Kilroy had no intention of actually working with Korman: instead, they planned to partner with the Kor Group for the Columbia Square Project.  In the email, Mr. Simon told Mr. Korzen, "very important that you keep this confidential as I mentioned I have some other discussions going on."

45.     Mr. Korman was shocked by the email, and called Mr. Simon immediately.  Mr. Simon explained that Mr. Korzen was simply a friend, and that Mr. Korman had nothing to worry about.  However, the following week, Mr. Korman had a breakfast meeting scheduled with Mr. Simon.  Mr. Simon never showed up, and when Mr. Korman called to ask for an explanation, Mr. Simon explained that it was just a misunderstanding, and that he had simply forgotten about another commitment.

46.     Following this debacle, however, Mr. Simon and John Kilroy, the CEO of Kilroy, both refused to return phone calls regarding the project, and ceased all communication with Korman.

47.     In late July, Kilroy officially unveiled the Columbia Square Project, and announced it would be partnering with Mr. Korzen and the Kor Group for the Columbia Square Project's development.  No mention was made of Korman's efforts in the development of the project.

48.     Kilroy never explicitly notified Korman that the business relationship between the parties was terminated: instead, Kilroy simply proceeded to develop the

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

862279

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

1   project without Korman.  Korman was never paid a termination fee, nor did the
2   company receive any compensation or recognition for its contributions to the project.

### Kilroy Copies AKA's Trade Dress

4   49.     In January 2014, Kilroy announced in *Business Wire* that the residences
5   developed as part of the Columbia Square Project ("Columbia Square Residences")
6   would contain "luxuriously furnished extended stay apartment homes which will cater
7   to traveling business, entertainment, and creative professionals."  Like the AKA
8   properties, the Columbia Square Residences would "combine the warmth and comfort
9   of home with the luxury and pedigree of a five-star hotel."

10  50.     Furthermore, the furnished units would contain "fine wood cabinetry," as
11  well as "aged wood flooring" and "professional kitchens," much like the AKA
12  properties. The "sophisticated, neutral color palette" closely resembles that of
13  Korman's own properties, as do the design of the Columbia Square Residence's lobby
14  lounge and bar, state of the art media rooms, and event space.

15  51.     Although Korman is no longer involved, Kilroy's development of the
16  Columbia Square Project is ongoing.  Korman has been substantially harmed by the
17  use of its confidential information and trade dress, and the time and money the
18  company expended in the development of the Columbia Square Project.

### FIRST CLAIM FOR RELIEF

### (Breach of Contract)

21  52.     Korman realleges and incorporates by reference each and every
22  allegation contained in the above paragraphs as if fully set forth herein.

23  53.     Commencing on or about April 19, 2013, Plaintiff Korman and
24  Defendant Kilroy entered into a valid and legally enforceable Initial Contract for the
25  management of 200 luxury apartments to be developed at Columbia Square.  The
26  Initial Contract, signed by Mr. Simon, constitutes a valid and legally enforceable
27  written contract for Korman's services.

28

862279

54.     Defendants owe a contractual duty to Korman to perform their obligations under the Initial Contract.  Specifically, Kilroy owes Korman a duty to utilize Korman for the management of 200 luxury apartments to be developed at Columbia Square.  The specific duties under the agreement included "management, marketing, sales, marketing activities, website development, brand advertising, tradeshows [and] PR" as well as other assorted duties.  In exchange for these services, Kilroy agreed to provide Korman with management and franchise fees, incentive fees, and a development consultant fee. Under the terms of the agreement, if Kilroy continued development of the project without using Korman's services, Kilroy would be required to pay a termination fee.

55.     Korman has performed all conditions, covenants and obligations required of it pursuant to the terms of the Initial Contract, except as such performance may have been excused or prevented by material breach by Defendant Kilroy.  Korman is ready and willing to perform as required by the Initial Contract.

56.     Kilroy has breached the Initial Contract by, among other things, continuing to develop the Columbia Square Project without Korman's assistance and replacing Korman with the Kor Group.

57.     As a result of Kilroy's actions, Korman has suffered actual damages in the form of time and effort expended on the Columbia Square Project, as well as the loss of significant profits Korman stood to gain from its involvement in the Columbia Square Project.

58.     Furthermore, Kilroy has failed to pay Korman the termination fee specified in the Initial Contract, despite the fact that Kilroy is required to pay this fee if the development of Columbia Square proceeds without Korman's assistance.

59.     By reason of Kilroy's breach, Korman is entitled to compensatory damages and lost profits.

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

862279

## SECOND CLAIM FOR RELIEF

### (Misappropriation of Trade Secrets)

60.     Korman realleges and incorporates by reference each and every allegation contained in the above paragraphs as if fully set forth herein.

61.     At all relevant times, Korman was the owner of trade secrets as defined by California's Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426.1(d), which included, but were not limited to, the Korman Trade Secrets.

62.     On information and belief, Defendant Kilroy improperly acquired and used the Korman Trade Secrets without Korman's express or implied consent and disclosed the Korman Trade Secrets to Brad Korzen and the Kor Group.   The trade secrets at issue were improperly acquired and used by Kilroy, as Defendant Kilroy acquired these secrets through their business relationship with Korman, circumstances which gave rise to a duty to  maintain their secrecy, and limit use and disclosure.

63.     On information and belief, Kilroy was fully aware at the time the Korman Trade Secrets were obtained that Korman intended them solely for Korman's use as part of the contractual agreement between Korman and Kilroy.  Kilroy knew that the Trade Secrets at issue were not to be used for any other purpose or disclosed to third parties.

64.     Each of Korman's Trade Secrets were marked "Confidential" and were only supplied to a single person at Kilroy, Mr. Simon.

65.     Defendants' wrongful conduct in misappropriating and using the Korman Trade Secrets, unless and until enjoined and restrained by order of this Court pursuant to Cal. Civ. Code § 3426.2(a), will cause great and irreparable injury to Korman and its business.

66.     As a direct and proximate result of Defendants' wrongful conduct, Korman has suffered actual damages and damages for unjust enrichment in an amount to be determined at trial.

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

862279

1    67.    Kilroy's actions were willful, wanton, malicious and oppressive and

2  justify an award of exemplary damages in an amount twice the amount that Korman

3  has been damaged pursuant to Cal. Civ. Code § 3426.3(c), and attorneys' fees and

4  costs pursuant to Cal. Civ. Code § 3426.4.

5    **THIRD CLAIM FOR RELIEF**

6    **(Trade Dress Infringement in Violation of 15 U.S.C. §1125 et seq.)**

7    68.    Korman realleges and incorporates by reference each and every

8  allegation contained in the above paragraphs as if fully set forth herein.

9    69.    The AKA Trade Dress is inherently distinctive and/or has acquired

10 distinctiveness.

11   70.    On information and belief, Kilroy, without Korman's consent, has

12 reproduced, and recreated a colorable imitation of the design features of Korman's

13 flexible-stay furnished hotel residences using the AKA Trade Dress.  Kilroy has

14 promoted these trade dress features in commerce, by incorporating them into their

15 rental residences at Columbia Square, and such use is likely to cause confusion,

16 deception, and mistake by creating the false and misleading impression that Kilroy's

17 Columbia Square is endorsed, sponsored, approved, or licensed by Korman.

18   71.    On information and belief, Kilroy's activities have caused and, unless

19 enjoined by this Court, will continue to cause a likelihood of confusion and deception

20 of members of the trade and public, and, additionally, injury to Korman's goodwill

21 and reputation as symbolized by the AKA residences and AKA Trade Dress, for

22 which Korman has no adequate remedy at law.

23   72.    Due to Kilroy's actions, Korman has suffered and will continue to suffer

24 losses, including but not limited to lost sales, rentals and business opportunities and

25 damage to Korman's reputation and the Korman brand, and, if not preliminarily and

26 permanently enjoined, Kilroy will have unfairly derived and will continue to unfairly

27 derive, income, profits and business opportunities as a result of its acts of

28 infringement.

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

862279

73.     Kilroy's actions demonstrate an intentional, willful, and malicious intent to trade on Korman's exclusive rights and the goodwill associated with the AKA brand and AKA Trade Dress to Korman's great and irreparable injury.

74.     Kilroy has caused and is likely to continue causing substantial injury to the public and to Korman, and Korman is entitled to injunctive relief under Lanham Act §43(a) and to recover its actual damages and defendants' profits, as well as its attorneys' fees and costs.

## FOURTH CLAIM FOR RELIEF

### (Fraud In the Inducement)

75.     Korman realleges and incorporates by reference each and every allegation contained in the above paragraphs as if fully set forth herein.

76.     As explained above, Kilroy knowingly and intentionally misrepresented multiple material facts to Korman regarding the Columbia Square Project, and likewise concealed critically important information from Korman inextricably related to Kilroy's representations, including but not limited to the fact that Kilroy had no intention of working with Korman on the Columbia Square Project, and that Kilroy fully intended to work with the Kor Group.

77.     Defendants made their false representations, and concealed information, with the specific intent of defrauding Korman and inducing Korman to enter into the agreement detailed in the Initial Contract and to disclose confidential information to Kilroy.

78.     Korman was aware it was entering into a contractual relationship with Kilroy, however, Korman was unaware of the information concealed by Kilroy, and believed Defendants' false representations.  Korman would not have entered into the contract or disclosed confidential information if not for Kilroy's representations and omissions. In direct reliance on Kilroy's false representations, and without knowledge of the critically important information concealed by Defendants, Korman: (1) invested substantial time and money in performing its responsibilities under the terms

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

1  of the Initial Contract, including marketing and development of the Columbia Square

2  Project; (2) declined to undertake other competing projects; and (3) disclosed

3  valuable confidential information to Kilroy.

4      79.    As a direct and proximate result of the misrepresentations, concealment

5  and fraud, Korman incurred actual damages, in a total amount to be determined

6  according to proof at trial.

7      80.    As explicated above, all of which is incorporated into this paragraph, on

8  information and belief, Kilroy perpetrated the foregoing conduct, misrepresentations

9  and concealment with: (1) an actual and specific intent to harm Korman, (2)

10  oppression and malice, and (3) an actual and specific intent to defraud Korman.

11  Among other things, Kilroy knew, prior to the execution of the Initial Contract, that it

12  had no intention to work with Korman or to develop the Columbia Square project

13  with it, and fully intended to use Korman's confidential information to develop the

14  project with the Kor Group.  Defendants intentionally concealed this critically

15  important information from Korman, and made related false representations, for the

16  specific purpose, and with the specific intent, of defrauding Korman.

17      81.    Based on the foregoing, Korman is entitled to recover compensatory

18  damages in an amount to be proven at trial, and exemplary and punitive damages

19  from Kilroy in an amount sufficient to prevent and dissuade Defendants from

20  perpetrating similar fraudulent conduct in the future.

21                    **FIFTH CLAIM FOR RELIEF**

22              **(Fraud: Promise with No Intent to Perform)**

23      82.    Korman realleges and incorporates by reference each and every

24  allegation contained in the above paragraphs as if fully set forth herein.

25      83.    As explicated above, on information and belief, Kilroy knowingly and

26  intentionally made a promise to Korman that the two companies would act as partners

27  in the development and management of the Columbia Square Project as detailed in

28  the Initial Contract.

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

862279

84.     In doing so, Kilroy misrepresented a material fact, namely that the companies would work with one another to complete the Columbia Square Project, when Kilroy actually intended to work with the Kor Group.  On information and belief, Kilroy had no intention of fulfilling the promises to Korman contained in the Initial Contract, and instead, planned to use Korman's confidential information to develop the Columbia Square project with the Kor Group instead.

85.     Kilroy made the promises contained in the Initial Contract without any intent to perform, with the specific intent of defrauding Korman and inducing Korman to enter into the agreement detailed in the Initial Contract and to disclose confidential information to Kilroy.

86.     Korman was unaware of Kilroy's intent not to perform the promise, and believed that it was entering into a valid contractual relationship with Kilroy.

87.     In direct reliance on Kilroy's promise, and without knowledge that Kilroy had no intention of performing its promises, Korman: (1) began performing its responsibilities under the terms of the Initial Contract, including marketing and development of the Columbia Square Project; (2) declined to undertake other competing projects; and (3) disclosed valuable confidential information to Korman.

88.     As a direct and proximate result of the misrepresentations, concealment and fraud, Korman incurred monetary damages, including actual damages, in a total amount to be determined according to proof at trial.

89.     As explicated above, all of which is incorporated into this paragraph, on information and belief, Kilroy perpetrated the foregoing conduct, misrepresentations and concealment with: (1) an actual and specific intent to harm Korman, (2) oppression and malice, and (3) an actual and specific intent to defraud Korman. Among other things, Kilroy knew, prior to the execution of the Initial Contract, that they had no intention to work with Korman or to develop the Columbia Square project with them, and fully intended to use Korman's confidential information to develop the project with the Kor Group.  Defendants intentionally concealed this

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

critically important information from Korman, and made related false representations, for the specific purpose, and with the specific intent, of defrauding Korman.

90.     Based on the foregoing, Korman is entitled to recover actual damages to be proven at trial, as well as exemplary and punitive damages from Kilroy in an amount sufficient to prevent and dissuade Defendants from perpetrating similar fraudulent conduct in the future.

## SIXTH CLAIM FOR RELIEF
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

91.     Korman realleges and incorporates by reference each and every allegation contained in the above paragraphs as if fully set forth herein.

92.     Commencing on or about April 19, 2013, Plaintiff Korman and Defendant Kilroy entered into a valid and legally enforceable Initial Contract for the management of 200 luxury apartments to be developed at Columbia Square.

93.     The Initial Contract imposes on each party a duty of good faith and fair dealing, requiring each party to refrain from doing anything which would render performance of the contract impossible and to do everything that the contract presupposes each party will do to accomplish its purpose.

94.     Kilroy has breached the implied covenant of good faith and fair dealing, by, among other things, inducing Korman to provide its trade secrets and know-how to the Columbia Square Project when Kilroy never intended to partner with Korman, preventing Korman from acting as its partner in the development of the Columbia Square Project and after obtaining Korman's valuable trade secrets and services, replacing Korman with a different partner without Korman's knowledge or consent.

95.     As a proximate and direct result of Kilroy's breach of the implied covenant of good faith and fair dealing, Korman has suffered actual damages in the form of time and effort expended on the Columbia Square Project, as well as the loss of significant profits Korman stood to gain from their involvement in the Columbia Square Project.

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

862279

96.    By reason of Kilroy's breach,  Korman is entitled to compensatory damages.

## SEVENTH CLAIM FOR RELIEF

### (Unjust Enrichment)

97.    Korman realleges and incorporates by reference each and every allegation contained in the above paragraphs as if fully set forth herein.

98.    As a result of the receipt of the Korman Trade Secrets, as well as the time, labor, and money Korman invested in the Columbia Square Project, Kilroy has received a significant benefit at Korman's expense.  Rather than having to compensate Korman for the amount of time spent on this project, or the savings to Kilroy from obtaining the Korman Trade Secrets, Kilroy has received the free benefit of Korman's labor and experience.

99.    The benefit received by Kilroy came at substantial cost to Korman, which has invested significant time and money in  the development of the Korman Trade Secrets, as well as the development, management and design of the Columbia Square Project.

100.   By reason of Kilroy's breach, Korman is entitled to restitution by disgorgement of the amounts by which Kilroy has been unjustly enriched.

## PRAYER FOR RELIEF

WHEREFORE, Korman prays for judgment as follows:

1.    For an injunction prohibiting Kilroy from continued use or disclosure of the Korman Trade Secrets;

2.    For actual and compensatory damages in an amount according to proof at trial;

3.    For disgorgement of the amounts by which Kilroy has been unjustly enriched;

4.    For attorneys' fees and costs incurred by Korman in this action;

COMPLAINT

862279

5.     For an award of punitive and exemplary damages under California law, including twice Korman's actual damages for theft of trade secrets under Cal. Civ. Code §3426.3(c); and

6.     For an award of such other and further relief as the Court deems just and proper.

DATED:  April 2, 2014                    By: _Adrian M. Pruetz_

ADRIAN M. PRUETZ
ERICA J. VAN LOON
JESSICA E. MENDELSON
GLASER WEIL FINK JACOBS
  HOWARD AVCHEN & SHAPIRO LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067

*Attorneys for Plaintiff*
*SHK Management, Inc.*

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

862279

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff  Korman respectfully requests a jury trial on all issues triable by jury.

DATED:  April 2, 2014            By: _____
                                 ADRIAN M. PRUETZ
                                 ERICA J. VAN LOON
                                 JESSICA E. MENDELSON
                                 GLASER WEIL FINK JACOBS
                                   HOWARD AVCHEN & SHAPIRO LLP
                                 10250 Constellation Blvd., 19th Floor
                                 Los Angeles, CA 90067

                                 *Attorneys for Plaintiff*
                                 *SHK Management, Inc.*

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

862279